UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| Mark Emerton,<br><br>    Plaintiff,<br><br>v.<br><br>F/V Lydia and Maya, Inc.,<br><br>    Defendant. | Docket No. |

# COMPLAINT

Mark Emerton brings his complaint against the defendant as follows.

1. Mark Emerton (Mr. Emerton) is an individual residing in Old Orchard Beach, Maine.

2. At all times relevant to this complaint Mark Emerton was a member of the crew of F/V Perseus, and a "seaman" for the purposes of the Jones Act and the general maritime law of unseaworthiness.

3. F/V Perseus [Perseus] is a commercial fishing vessel, documented under the laws of the United States, official number 944403.

4. At all times relevant to this complaint, F/V Lydia and Maya, Inc. owned Perseus.

5. F/V Lydia and Maya, Inc. is a Maine corporation.

6.      This is a case of admiralty or maritime jurisdiction and asserts an admiralty or maritime claim within the meaning of Rule 9(h), F.R.Civ.P.

7.      We ask that the court assert jurisdiction over the cause in action pursuant to Title 28 U.S.C. 1333 (admiralty jurisdiction).

Facts Common to All Counts

8.      On or about August 27, 2019, Mark Emerton was on board Perseus, in the capacity of deckhand and in the employ of F/V Lydia and Maya, Inc.

9.      This was Mr. Emerton's second trip on Perseus. In the prior trip he was also a deckhand.

10.      On August 27, 2019, Perseus was trawling (dragging) for groundfish in the Gulf of Maine.

11.      The dragging operation required Perseus to tow behind the fishing boat a large net (otter trawl), with the intent of scooping hake, cod, haddock and other groundfish into the net.

12.      Attached as Exhibit A is a schematic drawing showing a typical otter trawl in operation.

13.      Modern trawlers store the net on a net reel, often mounted on a heavy frame which spans the stern ramp. Exhibit B shows a typical arrangement.

14.      Perseus had a second net reel mounted more nearly amidships, over the work deck. The ship could employ either net reel when fishing.

15.      During the incident which is the subject of this complaint, the ship used the midships net reel.

16. After towing for about four hours, Perseus began to "haul back", which is to say she stopped and began to reel in the net, cables, doors and other gear used in otter trawling.

17. As the net bag surfaced behind Perseus, the crew saw that a large animal had become trapped in the net.

18. Perseus stopped hauling back. It became clear that the animal was a large shark, some fifteen feet in length or more, with its head in the cod end of the net.

19. Occasionally trawlers end up with large sharks, turtles, manta rays or marine mammals in the net.

20. When a trawler brings a large animal onto the crowded confines of a fishing boat work deck, the situation presents a risk to crew, as the animal thrashes, slides, rolls or bites.

21. Therefore, and because doing so is rarely or never necessary, reasonable care demands that such an animal not be brought onto the work deck.

22. There are at least two correct techniques a trawler may employ to manage safely a large shark in the otter trawl. A shark must swim to pass water through its gills and thus gain oxygen. For that reason one technique is simply to leave the net in the water, with the boat stopped or nearly so, resulting in the shark in due course "drowning out", at which point it can be safely removed or cut free from the net.

23. Another technique is as follows: The net is reeled in so the cod end can be reached with a boat hook, while leaving the animal safely in the water, away from the crew and encased in the net. The crew ties off the distal end of the cod end to the trawler with stout rope, cuts the cod end (and perhaps some of the tailpiece) completely free from the rest of the net, and pulls on the rope. This technique causes the animal - along with the groundfish catch - to swim or fall out of the wide open cod end, and completely avoids the dangers of bringing such an animal onto the close quarters of a heaving, pitching and rolling work deck. The cod end is easily recovered, and sewing the cod end back to the tailpiece is a routine matter requiring little time.

24. Perseus elected to use neither of these methods.

25. Perseus chose to employ a method which retained the groundfish catch, but which posed a danger to the deckhands.

26. Perseus' captain reeled much of the net onto the midships net reel, which resulted in the shark being hauled up the stern ramp and partially onto the work deck.

27. The captain then ordered a long slash to be made in the net, at or near the shark.

28. The captain apparently hoped that when he lowered the cut net down the stern ramp and into the water, the shark would fall or swim out of the slash, allowing the catch from the four-hour tow to remain in the cod end.

29. Upon the cut being made, the shark's huge tail and part of its body emerged from the net, a great danger to the crew.

30. The captain then ordered the deck crew to pass the wire rope of a utility winch around the net and the shark, and hook the wire rope to itself, forming a loop.

31. The captain may have done so with the intent of lifting or restraining the shark so the cut could be enlarged, to better enable the shark to escape from the net when the net was put into the water.

32. When the wire began to close around the shark the shark, foreseeably, began rolling up in the net and wire, fouling the net and wire badly.

33. The captain then tried to reel some more of the net onto the net reel, but the fouled net and wire impeded that effort.

34. The captain then, for reasons best known to himself, ordered that a second utility winch wire also be attached to the net. This was done and the second wire tensioned.

35. The captain then apparently decided that his technique was not working, and that he had to get the shark off the deck and back in the water.

36. Before the net could be lowered into the water, the wire ropes from the two utility winches had to be slacked, the hooks opened, and the wire ropes and hooks pulled clear of the net, work that had to be accomplished next to a huge, lively, aggravated and only partially constrained shark.

37. The winch wires were slacked or attempted to be slacked. The captain ordered a deckhand to approach the net and the shark, and open the utility winch hooks and pull the wire ropes clear.

38. Until now Mr. Emerton, along with the rest of the deck gang who were not directly involved, had been sheltering from the shark behind the heavy net gallows frames, all the way aft.

39. The captain ordered Mark Emerton to get the second utility winch hook open and get that wire rope free of the net.

40. No sooner had Mr. Emerton left the relative safety of the net gallows frame when the shark thrashed and rolled, striking Mr. Emerton in the head and shoulders, causing him immediate severe injury from which he still suffers.

## Count One: Jones Act Negligence

41. Lydia and Maya, Inc., by, among other reasons, failing to use reasonable care in managing the large shark in the otter trawl, violated its obligation to Mark Emerton as set forth in Title 46 U.S.C. §30104, and caused him damage thereby.

## Count Two: Unseaworthiness

42. As his employer and as vessel operator, Lydia and Maya, Inc. is deemed by the law of seaman's personal injury to have warranted to Mr. Emerton that Perseus would be seaworthy.

43. The captain's failure to employ a correct technique for managing a large animal in the trawl, and indeed the entirely unnecessary presence of a large, lively, and unrestrained shark on the Perseus' work deck, among other facts, rendered Perseus unseaworthy.

44. The unseaworthiness represented a breach of Lydia and Maya Inc.'s warrant to Mark Emerton.

45. The unseaworthy conditions resulted in Mr. Emerton's injury as aforesaid.

## Count Three: Maintenance and Cure

46. Under the law of seamen's personal injury, Maya and Lydia, Inc., as owner of F/V Perseus and as his employer, is liable to Mark Emerton for the costs of his cure, and for his maintenance while he recovers.

WHEREFORE, Mark Emerton prays for a judgment against Maya and Lydia, Inc., and for money damages representing his past and future medical expenses; his lost earning capacity, including both past lost wages and diminished future earning capacity; his pain and suffering; loss of life's enjoyment, pre-judgment interest, the costs of his maintenance, cure, and such other damages as the law may allow.

Date:  October 24, 2022         /S/ *Nicholas H. Walsh*
                                Nicholas H. Walsh,
                                Counsel for Mark Emerton.
                                Nicholas H. Walsh P.A.
                                61 Old County Road
                                Freeport ME 04032
                                nwalsh@gwi.net
                                Federal bar no. 634


                                /s/ *Nicholas A. Brown*
                                Nicholas A. Brown
                                Counsel for Mark Emerton
                                Bernheim Kelley Battista & Bliss, LLC
                                4 Court Street, Ste. 300
                                Plymouth, MA 02360
                                nbrown@realjustice.com